970 So.2d 21 (2007)
Parma Matthis HOWARD and Jane Matthis Smith
v.
ADMINISTRATORS OF the TULANE EDUCATIONAL FUND.
No. 2006-CA-1276.
Court of Appeal of Louisiana, Fourth Circuit.
October 22, 2007.
Daniel J. Caruso, John F. Shreves, Shawn L. Holahan, Simon Peragine Smith *23 & Redfearn, LLP, New Orleans, LA, for Plaintiff/Appellant.
Dennis H. Tracey III, Catherine E. Stetson, R. Brian Black, Hogan & Hartson, L.L.P., New York, NY, and Edward H. Bergin Genevieve M. Hartel, Jones Walker Waechter Poitevent Carrere & Denegre, L.L.P., New Orleans, LA, for Defendant/Appellee.
(Court composed of Judge CHARLES R. JONES, Judge PATRICIA RIVET MURRAY, and Judge MAX N. TOBIAS JR.).
CHARLES R. JONES, Judge.
The Appellants, Parma Matthis Howard and Jane Matthis Smith, seek review of a district court judgment denying their petition for a preliminary injunction against the Administrators of the Tulane Educational Fund d/b/a Tulane University (hereinafter referred to as "Tulane").

Facts and Procedural History
In 1886, Mrs. Josephine Louise Newcomb donated $100,000.00 to Tulane University  an all male institution at the time  in memory of her deceased daughter, H. Sophie Newcomb. In her correspondence of October 11, 1886, to Tulane, Mrs. Newcomb advised that she was donating the aforementioned sum to the university for the establishment of the H. Sophie Newcomb Memorial College. Mrs. Newcomb explained the reason for her donation:
Feeling a deep personal sympathy with the people of New Orleans, and a strong desire to advance the cause of female education in Louisiana, and believing also that I shall find in the Board selected by the benevolent Paul Tulane, the wisest and safest custodian of the fund I propose to give, I hereby donate to your Board the sum of One Hundred Thousand Dollars to be used in establishing the H. Sophie Newcomb Memorial College, in the Tulane University of Lousiana, for the higher Education of white girls and young women. . . .
I do not mean in this my act of donation to impose upon you restrictions which will allow the intervention of any person or persons to control, regulate, or interfere with your disposition of this fund, which is committed fully and solely to your care and discretion with entire confidence in your fidelety[fidelity] and wisdom.
Mrs. Newcomb continued to donate monies to Newcomb College through Tulane until her death on April 7, 1901.
In her olographic will, dated May 12, 1898, Mrs. Newcomb specifically stated:
I have implicit confidence that the `Administrators of the Tulane Educational Fund' will continue to use and apply the benefactions, and property, I have bestowed and may give, for the present and future development of this Department of the University Known [sic] as the H. Sophie Newcomb Memorial College which engrosses my thought and purposes, and is endeared to me by such hallowed associations.
Tulane was Mrs. Newcomb's universal legatee and as such inherited the bulk of her estate, approximately $2,668,409.00, for the development of Newcomb College.
After Mrs. Newcomb's death, Tulane continued to operate Newcomb College as a separate college within its University for over a 100 years. However, in the aftermath of Hurricane Katrina, the Administrators of the Tulane Educational Fund decided to merge Newcomb College and Tulane College pursuant to Tulane's post-Katrina renewal plan.
On May 16, 2006, Ms. Howard and Ms. Smith, who aver that they are Mrs. Newcomb's great-great-nieces, sued Tulane to *24 enjoin it from closing and consolidating Newcomb College into a unified Newcomb-Tulane College. Ms. Howard and Ms. Smith (hereinafter referred to as "the Nieces") sought a preliminary injunction as well as a permanent injunction and a declaratory judgment ordering Tulane to carry out what they allege is a specific condition Mrs. Newcomb placed on her inter vivos donations and testamentary bequest: to maintain H. Sophie Newcomb College as a separate college for women specifically, within Tulane University in memory of H. Sophie Newcomb. In response, Tulane filed an exception of prescription, res judicata, no right of action and no cause of action.
On June 12, 2006, the district court heard the Nieces petition for injunctive relief. Tulane's exceptions were also to be heard on this date, but were not acted upon by the district court. The district court denied the Nieces' petition for preliminary injunction. It is from this judgment that the Nieces filed the instant appeal.

Assignments of Error
The Nieces raise four (4) issues on appeal:
1. The district court erred as a matter of law in not carrying out Mrs. Newcomb's intent for Tulane  as her universal legatee  to use the balance of her estate to maintain a women's higher education college and in not enjoining the Tulane Board from abolishing Newcomb College through its Renewal Plan and Resolutions;
2. The district court erred as a matter of law in ruling that the provision of Mrs. Newcomb's will did not include "an enforceable conditional obligation" sufficient to support the granting of a preliminary injunction enjoining the implementation of the Tulane Board's Renewal Plan and Resolutions, that abolish Newcomb College;
3. The district court erred as a matter of fact and law in ruling that the Nieces failed to make a prima facie case that they will suffer irreparable harm by the Tulane Board's implementation of the renewal plan; and
4. The district court erred as a matter of fact and law in ruling that the Nieces failed to make a prima facie case that they will prevail on the merits in showing that abolishing Newcomb College violates the express terms of Mrs. Newcomb's will.
Before addressing the merits of the Nieces petition for injunctive relief, we shall first address the issue of whether the Nieces have a right to bring this action.
The Nieces' Right of Action
In the instant appeal, the Nieces seek a preliminary injunction against Tulane to enjoin the merger of Newcomb College with Tulane's other undergraduate colleges pursuant to Tulane's post-Katrina Renewal Plan. The bringing of this action, however, poses a legal question that has yet to be resolved by Louisiana jurisprudence: can a "non-legatee/would-be heir" file suit for injunctive relief on behalf of a testator/donor? While we note that Tulane  in its reply brief  raised the issue of whether the Nieces had standing to file the instant lawsuit, Tulane did not file an answer to the appeal. Thus, Tulane is not entitled to dismissal of the appeal absent an answer to the appeal. Nevertheless, in the interest of judicial economy, we address the issue of whether the Nieces have a right of action. La.C.C.P. art. 927(B).
"There are two kinds of succession: testate and intestate." La. C.C. art. 873. Accordingly, there are two kinds of successors: *25 testate successors, who are called legatees, and intestate successors, who are called heirs. La.C.C. art. 876. "Thus, a legatee, as that term is understood, is one entitled to take possession of the estate of the deceased pursuant to the terms of a testament." In re Succession of Scott, 05-2609, p. 4 (La.App. 1 Cir. 11/3/06), 950 So.2d 846, 848. A testator, therefore, does not have heirs, but may theoretically have would-be heirs.
In the instant case, Tulane points out that Mrs. Newcomb died fully testate leaving the bulk of her estate to Tulane.[1] Tulane contends that the Nieces do not have standing to bring the instant suit against Tulane because neither the Nieces nor their ancestors were Mrs. Newcomb's legatees. Yet, the Nieces claim that Louisiana law and jurisprudence recognize that they have a right of action. For clarity, we will separately discuss the Nieces right to bring an action on Mrs. Newcomb's donations inter vivos and her testamentary bequest.

Inter Vivos Donations
In support of their contention that a testator's collateral relatives and would-be intestate heirs can sue on behalf of the testator/ relative to enforce a condition of an inter vivos donation, the Nieces cite two (2) cases: Frame v. Shreveport Anti-Tuberculosis League, 538 So.2d 684 (La. App. 2 Cir.1989), writ denied, 541 So.2d 896 (La.1989) and Voinche v. Town of Marksville, 124 La. 712, 50 So. 662 (1909).
In Frame, the heirs of a donor sued to revoke the donor's inter vivos donation of approximately 55 acres of land because the ultimate donee of property  the State  failed to comply with a condition of the donation. The donor made an inter vivos donation to the Shreveport Anti-Tuberculosis League under the condition that the property was to be used as a tuberculosis sanitarium or some other equally charitable purpose. The donation was made with the stipulation that the donation would be revoked if the property was not used for the intended or an equally charitable purpose.
In Voinche, an heir sued to revoke his relative's inter vivos donation of immovable property to the town of Marksville. Said property was donated to the town solely for the establishment of a market. Subsequent to the donor's death, the town failed to operate the store on the property and even allocated a portion of the land to construct a street. Just as in Frame, the donor's heir sued to revoke the donation pursuant to a reversionary clause contained within the act of donation.
In both Frame and Voinche, the heirs were suing for the revocation of the donations, not for injunctive relief, pursuant to reversionary clauses contained in the acts of donation. Also, it is unknown from reading these cases whether the donors died intestate. If they did, their heirs had a legally recognized right to pursue revocation because if the conditions of said donations were not being fulfilled, the donated properties would return to their relatives' respective estates.
These cases do not provide a precedent for non-legatee/would-be heirs to sue for injunctive relief on behalf of a donor, who died testate. Furthermore, these cases do not demonstrate that non-legatees/would-be heirs have the right to sue for injunctive relief against a donee that is also their relative's universal legatee.
*26 Moreover, Mrs. Newcomb's initial letter advising Tulane of her donation stated:
I do not mean in this my act of donation to impose upon you restrictions which will allow the intervention of any person or persons to control, regulate, or interfere with your disposition of this fund, which is committed fully and solely to your care and discretion with entire confidence in your fidelety and wisdom.
Mrs. Newcomb's words lucidly convey that she did not want anyone to tamper with Tulane's administration of her donation. She expresses her unconditional trust in Tulane's ability to manage her donation. Her language is clear and unambiguous. The donation does not contain a reversionary clause. Therefore, given the plain meaning of these words, we find that these terms bar the Nieces from interfering in Tulane's administration of Mrs. Newcomb's donations inter vivos. Thus, we do not find that the Nieces have a right to assert a claim for injunctive relief relative to Mrs. Newcomb's donations inter vivos.

Mortis Causa Donation
The Nieces cite Braquet v. Administrators of the Tulane Educational Fund, 304 So.2d 720 (La.App. 4 Cir.1974) in support of their position that a decedent's collateral relatives and would-be intestate heirs may sue on a testator's behalf to enforce a condition of a will.
In Braquet, the would-be heirs of a testator brought an action to nullify a bequest to the Administrators of Tulanes Educational Fund alleging that Tulane failed to fulfill a testamentary condition. The district court dismissed the action, but set a time limit of eighteen (18) months for Tulane to fulfill the testamentary condition, which mandated the construction of a chapel memorializing the testator's sister. The relatives appealed.
On appeal, we held that a delay of thirteen (13) years in fulfilling the condition was unreasonable; yet, in light of the testator's emphatic intent, Tulane was given further opportunity to construct the chapel. The Court modified the trial court's judgment, allowing Tulane twelve (12) months to begin construction and twenty-four (24) months to complete construction.
The facts of this case are distinguishable from the instant case. In Braquet, the collateral heirs filed suit in just over a decade after the testator's passing because Tulane had not constructed a chapel in fulfillment of the testator's condition. However, in the instant case, Mrs. Newcomb's dream of educating young women was realized before she passed and Tulane has maintained Newcomb College for over 100 years after her death.
The would-be heirs in Braquet filed a petition to have the legacy to Tulane revoked for nonperformance of the condition attached to its acceptance. The reversionary heirs were challenging Tulane's failure to timely construct a chapel, not because they wanted the chapel to be constructed, rather they wanted the bequest to Tulane nullified in order that they would receive the proceeds from their relative's estate. If the donation to Tulane would have been nullified, the estate would have devolved under the laws of intestacy to the heirs because Tulane was the sole legatee of the testator's will. Despite the relatives' petition, this Court chose to uphold the testator's intent and designated a timeline within which Tulane was to construct the chapel.
In the instant case, the Nieces solely seek injunctive relief. They are not pursuing the nullification of the bequest in order that they might procure the assets of Mrs. Newcomb's estate from Tulane. Furthermore, in Braquet, neither this *27 Court nor the district court acknowledged the right of collateral heirs to bring their suit. Indeed, the district court dismissed the suit and this Court did not address whether the plaintiffs had standing.
Lastly, unlike in Braquet, the district court in this case did not find that Mrs. Newcomb made a conditional bequest. In its reasons for judgment, the district court rationalized:
The Court finds that the provisions of Mrs. Newcomb's will did not create an enforceable conditional obligation that would support the granting of a preliminary injunction prohibiting Tulane from abolishing Newcomb College as a separate college within Tulane Universisty [sic].
In Mrs. Newcomb's will, she stated:
I have implicit confidence that the `Administrators of the Tulane Educational Fund' will continue to use and apply the benefactions, and property, I have bestowed and may give, for the present and future development of this Department of the University Known [sic] as the `H. Sophie Newcomb Memorial College' which engrosses my thought and purposes, and is endeared to me by such hallowed associations.
We agree with the district courts finding that Mrs. Newcomb did not impose a conditional obligation on her bequest. The language contained in Mrs. Newcombs will is more precatory in nature than it is binding. For instance, Mrs. Newcombs use of the word "confidence" in her testament reinforces her use of that word in her initial donation inter vivos to Tulane.
Mrs. Newcombs wording conveys that while she entrusted Tulane with the overseeing the development of Newcomb College, she did not impose any real conditions upon the institution to carry out her wishes. We do not find that the Nieces have a right of action against Tulane relating to Mrs. Newcombs donation mortis causa nor do we find that Mrs. Newcomb made a conditional bequest to Tulane in her testament.
Applicability of the Cy Pres Doctrine
The Nieces aver that they have a right to assert their claim under the Cy Pres doctrine. La. R.S. 9:2331, which sets forth the Cy Pres doctrine, states:
In any case in which circumstances have changed since the execution or probate of a will containing a trust or conditional bequest for charitable, educational or eleemosynary purposes, or since the death of the donor who during his lifetime established a trust or made a conditional donation for any of such purposes, and the change in circumstances is such as to render impractical, impossible or illegal a literal compliance with the terms thereof, the district court having jurisdiction of the succession of the testator or of the domicile of the donee (and in the parish of Orleans, the civil district court) may, upon petition of a trustee, or of the person or corporation having custody or possession of the property subject to said trust, conditional bequest or donation or of any heir, legatee or donee who in the absence or invalidity of such trust, conditional bequest or donation would have been entitled to any part of the property contained therein, in accordance with the procedure hereinafter set forth, enter a judgment directing that such charitable trust, devise or conditional bequest or donation shall be administered or expended in such manner (either generally or specifically defined) as, in the judgment of said court, will most effectively accomplish as nearly as practicable under existing conditions the general purpose of the trust, will or donation, without regard to and free from any *28 specific restriction, limitation or direction contained therein. [Emphasis added.]
In addition to being applicable to donations mortis causa, the Cy Pres doctrine applies to inter vivos donations made before 1970. Ada C. Pollock-Blundon Ass'n, Inc. v. Nieces of Evans, 273 So.2d 552, 554 (La.App. 1 Cir., 1973).
Because we find that none of Mrs. Newcomb's donations were conditional, this argument has no merit. Furthermore, no courts in Louisiana nor in any other state have held that an heir has the right to sue for injunctive relief pursuant to this doctrine. Therefore, we do not find that the Nieces have standing under the Cy Pres doctrine.
Furthermore, even if this doctrine could be applied to the case sub judice, the doctrine seemingly lends more support to Tulane's renewal plan for Newcomb College. Hurricane Katrina was the catalyst that changed the circumstances in which Newcomb College operated and has rendered impractical the operation of a college considering that no female students enrolled for the fall 2006 semester. Consolidating Newcomb College with Tulane's other colleges, conferring degrees to a larger student population bearing H. Sophie Newcomb's name and creating the H. Sophie Newcomb Memorial College Institute will "most effectively accomplish as nearly as practicable under existing conditions the general purpose" of Mrs. Newcomb's desire to have a lasting memorial to her daughter and to provide for the education of women.
We find that the Nieces do not have a right to bring this action. Further, Tulane's argument on appeal relating to the Nieces' lack of standing may be considered by the district court on Tulane's exception of no right of action. Therefore, we pretermit discussion of the other issues raised on appeal and remand.

Decree
For the foregoing reasons, the judgment of the district court is affirmed. In light of Tulane's exception of no right of action, which was not acted upon by the district court, this matter is hereby remanded to the district court with instructions to grant the exception of no right of action and to dismiss the appellants' petition for a preliminary injunction. Each party is to bear its own costs.
AFFIRMED.
TOBIAS, J., Dissents and Assigns Reasons.
TOBIAS, J., Dissenting.
I respectfully dissent. The majority and I have honest, divergent views of the law and the facts from the record in this case
The issues before the court are threefold: (1) whether the plaintiffs are the claimed heirs/collateral relatives of Mrs. Josephine Louise Newcomb ("Mrs. Newcomb"), thereby having a right of action to pursue litigation arising out of their late great-great aunt's original inter vivos donation of $100,000 and olographic will (donation mortis causa); (2) whether Louisiana law recognizes a cause of action to enforce a donation inter vivos or mortis causa based on the donative intent of the donor, and, concomitantly who has the right to seek enforcement of the donor's intent after the death of the donor; and (3) whether Mrs. Newcomb's intent in making the donations inter vivos and mortis causa to the Board of Administrators of the Tulane Educational Fund ("Tulane Board") required the donation to be used solely for the maintenance and development of Newcomb College, and more specifically a "college" *29 as that term is commonly understood.
I. Right of Action
To resolve the issue of whether the plaintiffs have a right of action, and therefore, standing to bring the instant suit, the court is required to determine whether the plaintiffs are, in fact, Mrs. Newcomb's heirs or successors, or possess the right of action by some other means or method.[1] The Tulane Board filed an exception of no right of action pursuant to La. C.C.P. art. 927, alleging the plaintiffs lack standing because they failed to establish that they or their ancestors inherited any rights from Mrs. Newcomb to which they succeeded to pursue the instant litigation. In response, the plaintiffs filed sworn affidavits attempting to establish their descent from Mrs. Newcomb and their right of action. The trial court neither considered the Tulane Board's exception nor ruled upon whether the plaintiffs can seek enforcement of the conditional disposition of Mrs. Newcomb's donations.[2] The majority addressed the standing issue sua sponte and determined that a would-be intestate heir/collateral relative does not possess a right of action to sue on behalf of a donor and/or testator to seek injunctive relief or to enforce a donation inter vivos or causa mortis. The majority's ruling, which effectively dismisses the plaintiffs' case, eliminates the plaintiffs' opportunity to have a hearing and present evidence on the standing issue as authorized by La. C.C.P. art. 931,[3] and deprives them of the chance to supplement and/or amend their petition to cure any deficiency. See La. C.C.P. art. 934.[4]
The majority ignores the Louisiana's Supreme Court decision, albeit an 1836 case, in Poydras v. Taylor, 9 La. 488, 1836 WL 868 (1836), where the Court specifically held that a decedent's heirs succeed to all of the ancestor's rights, and have a right of action to seek enforcement of a disposition in the will. Thus, Louisiana law recognizes a right of action for an heir, which would include a "would-be" heir, to sue on behalf of an ancestor to enforce a testamentary bequest. By failing to hold a hearing on defendant's exception of no right of action, the plaintiffs are forever precluded from establishing their heirship and rights as successors to the decedent and, thus, their right of action to file the instant suit. Consequently, given the ramifications of a complete dismissal of plaintiffs' case  the closing of a 120-year-old institution  I would remand this matter to the trial court for a hearing on the Tulane Board's exception of no right of action and afford the plaintiffs the opportunity to amend their petition to more accurately *30 establish their standing rather than this court rule sua sponte.[5]
II. Cause of Action to Enforce a Condition of a Donation
Pretermitting for the moment whether the plaintiffs are, in fact, the "would-be heirs" of Mrs. Newcomb, the next issue is whether Louisiana law recognizes a cause of action to enforce a charge or condition contained in a donation inter vivos and/or mortis causa. To properly answer this question, one must look to the law in effect at the time the donation. Succession of Dowling, 93-1902 (La.App. 4 Cir. 2/25/94), 633 So.2d 846, 855; Succession of Czindula, 99-1686 (La.App. 4 Cir. 1/5/00), 751 So.2d 986. According to La. C.C. art. 1610.1, "[t]he same causes that authorize an action for the revocation of a donation inter vivos are sufficient to authorize an action for revocation of testamentary dispositions." Among the causes for which a donation inter vivos may be revoked is the "non-performance" of a condition or charge that has been imposed on the donee. La. C.C. arts. 1559(3), 1565-1569. This court has previously held that La. C.C. art. 1610.1 permits a donation mortis causa to be revoked if the donee has failed to fulfill a condition or charge to which the donation may have been subjected.[6]
Considering jurisprudence constante, where a Louisiana Civil Code article has been derived from a French Civil Code (Code Napoléon) article, interpretation of the latter is highly instructive for, if not determinative of, interpretation of the former. See, e.g., Bartlett v. Calhoun, 412 So.2d 597 (La.1982); Higgins Oil & Fuel Co. v. Guaranty Oil Co., 145 La. 233, 82 So. 206 (1919). The derivation of La.C.C. art. 1610.1 is as follows: La.C.C. art. 1710 (1870); La.C.C. art. 1703 (1825); La. Digest bk. III, tit. II, art. 198 (1808); Code Napoléon art. 1046 (1804). For these reasons, the interpretation of La. C.C. art. 1610.1 must be guided by the interpretation of the Code Napoléon art. 1046.
The affidavit of John Randall Trahan was admitted into evidence on this issue. According to Mr. Trahan, under Code Napoléon art. 1046, the right to revoke a donation mortis causa for nonexecution of a condition or charge belongs, inter alia, to those who would benefit if the donation mortis causa were to be revoked.[7] Because the revocation of a universal donation mortis causa would accrue to the benefit of the intestate successors (heirs), the heirs have the right to revoke such a donation for non-execution of a condition *31 or charge.[8] Concomitantly and by logic, heirs and successors have a right to assure that their predecessor's wishes expressed in writing by either donation inter vivos or mortis causa are enforced. After all, who else has a bona fide interest?
Under Code Napoléon art. 1046, one who has the right to revoke a donation mortis causa (and by implication a donation inter vivos) for non-execution of a condition or charge also has the right to enforce the obligation or charge.[9] Thus, it follows that where a universal donation mortis causa (and by implication a donation inter vivos) has been subjected to a condition or charge that has not been carried out, Code Napoléon art. 1046 provides an avenue for the heirs to bring suit to enforce that condition or charge. Although Code Napoléon art. 1046 has evolved over the past two centuries, there is no logical or legal reason why the application of La. C.C. art. 1610.1 should not have the same legal effect as its predecessors; that is, the one who has the right to revoke a donation inter vivos and/or mortis causa for non-execution of a condition should likewise have the corollary right to enforce it.[10]
The Supreme Court's ruling in Poydras v. Taylor, supra, supports this interpretation and application of La. C.C. 1610.1, and its predecessor versions. In Poydras, the testator's heir, who inherited nothing from the decedent, sought injunctive relief in order to maintain the conditions and requirements of the testator's will, and to have a sale by the defendant voided because the sale violated the terms of the testator's will. The Supreme Court not only recognized the heir's right to bring the action, but further recognized an heir's right to enforce a charge on a testator's bequest stating "[it] is their duty to see his intentions, as expressed in his last will and testament, [are] faithfully executed and carried into effect." Poydras v. Taylor, 9 La. 488, 1836 WL 868 *3 (1836). Therefore, in Louisiana a right to revoke a bequest belongs to the heirs who would have inherited the bequeathed property had the bequest not been made or had failed. *32 These same heirs, based on the previously referenced code articles and the Supreme Court's pronouncement in Poydras have the right to enforce the conditions of a donation. Accordingly, assuming Mrs. Howard and Mrs. Smith can establish their right to assert a cause of action, I find that Louisiana law recognizes a cause of action to enforce a charge or condition on a donation.
III. The Donative Intent of Mrs. Newcomb's Donation
In Louisiana, the intention of the donor (such as a testator) is the single most important guideline in the interpretation of a document making the donation, and when ascertained, must be enforced, when not violative of law. Succession of Blakemore, 43 La. Ann. 845, 9 So. 496 (1891). Moreover, the intention of the donor must be ascertained from the whole document(s) establishing the donation with effect given to every part of the document(s) as the law permits. Succession of Logan, 384 So.2d 830 (La.App. 4 Cir.1980). When interpreting a testament (and by implication a document making a donation), Louisiana courts are guided by La. C.C. arts. 1611-1616. In the case at bar, La. C.C. arts. 1611 and 1612 are particularly relevant. La. C.C. art. 1611 provides, in pertinent part:
The intent of the testator controls the interpretation of his testament. If the language of the testament is clear, its letter is not be disregarded under the pretext of pursuing its spirit. The following rules for interpretation apply only when the testator's intent cannot be ascertained from the language of the testament. In applying these rules, the court may be aided by any competent evidence.
Further, La. C.C. art 1612 provides:
A disposition should be interpreted in a sense in which it can have effect, rather than in one in which it can have none.
"[T]he function of the courts is to carry out the intention of the testator" and to give effect to all language contained in the will if possible. Succession of Bel, 377 So.2d 1380, 1383 (La.App. 4 Cir.1980), citing Succession of Stewart, 301 So.2d 872, 877 (La.1974). See also Giroir v. Dumesnil, 248 La. 1037, 184 So.2d 1 (1966). In doing so, if the testament (or document) is ambiguous with regard to a particular clause or bequest, other clauses or bequests are considered to reach an interpretation which harmonizes the provisions therein. Succession of Meeks, 609 So.2d 1035 (La.App. 2 Cir.1992). Thus, what is stated in one segment of the document or testament may be called upon to explain what is meant in an unclear part. Succession of Montegut, 430 So.2d 1024 (La.App. 5 Cir.1982). Further, when an ambiguity exists as to the donor's intent, the court not only may, but rather, must consider "any [and all] competent evidence." La. C.C. art. 1611(A); see also Succession of Stewart, 301 So.2d 872 (La.1974). This "competent evidence" includes "extrinsic evidence," which includes acts done by the donor after he/she has made the donation. Succession of Ehrenberg, 21 La. Ann. 280, 1869 WL 4358 (1869); Clark v. Preston, 2 La. Ann. 580, 1847 WL 3169 (1847).
Regarding Mrs. Newcomb's donative intent, in its reasons for judgment, the trial court stated:
A clear reading of Ms. Newcomb's will shows that she intended for Tulane, as universal legatee, to use the balance of her estate to maintain a women's higher education college. [Emphasis supplied.]
Having found that the intent of Mrs. Newcomb's bequest to the Tulane Board was so "clear," Louisiana law mandates the trial court to implement that intent; that *33 is, the court must ensure that Mrs. Newcomb's donations to the Tulane Board are used to maintain a "women's higher education college" [emphasis added]  not a "women's institute."[11] The trial court's failure to do so was an incorrect interpretation of the law and at the very least clearly wrong. Moreover, the ruling of the trial court is internally inconsistent. On the one hand, the trial court delineated Mrs. Newcomb's clear intent to establish a women's higher education college, yet, on the other, determined that Mrs. Newcomb's donations were not subject to any restrictions or conditional obligations. My reading of the 1886 letter and the 1898 will, both in its entireties, reveals that the condition Mrs. Newcomb placed on her donations, and her sole intent in making them, was that the money be used to maintain a women's higher education college. Tulane Board's decision to abandon Newcomb College, not only violates, but completely ignores, Mrs. Newcomb's intent-she wanted her money to be used for the "H. Sophie Newcomb Memorial College" [emphasis supplied]. The donations were clearly conditional  conditioned that the monies go for the use of a college to be known as the "H. Sophie Newcomb Memorial College."
Both the trial court and the majority find that Mrs. Newcomb did not impose a conditional obligation on her bequest, and therefore, no restrictions how the bequest be used. This is inaccurate as a matter of law and fact if not just plain terminologically inexact. Nothing in the nature of Mrs. Newcomb's donations  cash money  would preclude the finding of a conditional obligation. Regarding a universal legacy, a donor may freely subject that legacy to whatsoever condition(s) he/she may choose, provided that the condition(s) is not contra bonos mores. See La. C.C. art. 1519. As noted above, in such a matter, "[t]he intent of the testator controls." La. C.C. art. 1611(A).
The trial court and majority's consideration of extrinsic evidence beyond the four corners of 1886 letter and 1898 testament would have one conclude that the documents are ambiguous.[12] This is incorrect. While the Tulane Board has modified the operation of Newcomb College over the years to conform to the changing times, it has always operated and maintained Newcomb College as a separate entity and coordinate women's college, strongly suggesting (possibly conclusively) that the Tulane Board recognized a charge upon Mrs. Newcomb's donations. Moreover, over the years since the establishment of Newcomb College, the Tulane Board and its agents likely sought donations from third parties (including alumnae) for the H. Sophie Newcomb College.[13]
*34 Newcomb College provided its own dean, degrees, diplomas, advisors, graduates, campus, student body, senate, and programs designed for the benefit of women. Moreover, Newcomb College has its own funds, both endowed and functioning as an endowment. In June 2005, all Newcomb College endowments totaled $41,375,651. Thus, for nearly 120 years, the Tulane Board has understood and accepted the condition Mrs. Newcomb placed on her donation inter vivos, and later upon her donation mortis causa.
The Tulane Board, in support of its position, refers to the 1886 letter wherein she made her initial donation. Specifically, the Tulane Board quotes the following language:
But I do not mean in this my act of donation to impose upon you restrictions which will allow the intervention of any person or persons to control, regulate or interfere with your disposition of this fund, which is committed fully and solely to your care and discretion with entire confidence in your fidelity and wisdom.
The Tulane Board and the majority take this phrase out of context by deleting the preceding language in the same paragraph, thereby suggesting that the quoted language stands alone.[14] However, the entire paragraph reads as follows:
I request that you will see that the tendency of the institution shall be in harmony with fundamental principles of the Christian religion, and to that end, that you will have a Chapel or assembly room in which Christian worship may be observed daily for the benefit of the students. But I desire that the worship and instruction shall not be of a sectarian or denominational character. I further request that the education given shall look to the practical side of life, as well as to literacy excellence. But I do not mean in this my act of donation to impose upon you restrictions which will allow the intervention of any person or persons to control, regulate or interfere with your disposition of this fund, which is committed fully and solely to your care and discretion with entire confidence in your fidelity and wisdom.
I find the language relied upon so heavily by the trial court and the majority to support their position is actually meant to remove any perceived restriction regarding the building and operation of the chapel, not to remove any restriction on the Tulane Board's use of Mrs. Newcomb's money solely for the creation and maintenance of a women's college. Again I note that the 1886 letter also states:
Feeling a deep personal sympathy with the people of New Orleans, and a strong desire to advance the cause of female education in Louisiana, and believing also that I shall find in the Board selected by the benevolent Paul Tulane, the wisest and safest custodian of the fund I propose to give, I hereby donate to your Board the sum of One Hundred Thousand Dollars to be used in establishing the H. Sophie Newcomb Memorial College in the Tulane University of Louisiana for the higher education of . . . girls and young women. . . ."[15] [Emphasis supplied.]
The 1898 testament again refers to the "H. Sophie Newcomb Memorial College." The *35 foregoing language clearly denotes that Mrs. Newcomb wanted the money to be used for a college.
Additional evidence in the record supports this interpretation. Prior to her death, but after Newcomb College was established, and after having donated a substantial sum to the Tulane Board for the purpose, Mrs. Newcomb became disenchanted with the Tulane Board's operation of Newcomb College because Newcomb College was not being operated in accordance with her intent and purposes. Consequently, Mrs. Newcomb threatened to cease making additional donations to the Tulane Board and expressed her intention to establish a women's coordinate college in Georgia. Based on assurances that the Tulane Board would honor her intentions in the future, Mrs. Newcomb did not follow through with her threat and continued to donate to the Tulane Board.
Similarly, in a letter dated 16 May 1910, R.M. Walmsley, President of the Tulane Board, faced with the adoption of a policy governing the use of monies from the Newcomb Fund, acknowledged Mrs. Newcomb's sole object and intent in making her donations and later bequest:
[T]o create a memorial for women, in which post-graduate work can be done, and that no portion of the revenues of the fund be should be used beyond the portals of this women's memorial college, to and within which college should be confined the entire educational outlay. [Emphasis supplied.]
Moreover, in 1987, the Tulane Board passed several resolutions regarding the continued operation of Newcomb College and reaffirmed "the intent to maintain Newcomb College as Tulane's coordinated college for the liberal arts education of women." [Emphasis supplied.] In order to preserve and protect the viability of this intent, the Tulane Board created the Newcomb Foundation. Collectively, these actions clearly indicate the Tulane Board for over 100 years recognized, understood, and accepted the conditions imposed by Mrs. Newcomb upon her donations inter vivos and mortis causa.
Having determined Mrs. Newcomb's donative intent, the trial court erred by not granting the preliminary injunction. The effect of the trial court's ruling completely frustrates Mrs. Newcomb's intent by abolishing Newcomb College in toto.[16] However, if Mrs. Newcomb's intent in donating the money was to maintain a women's higher education college, her clear "intent" is the condition giving rise to the Tulane Board's obligation to do just that  maintain a women's higher education college. Therefore, the finding that Mrs. Newcomb's gifts were unrestricted and without conditions is clearly wrong.
In Louisiana, when a choice exists between two equally reasonable interpretations, one of which will effectuate and the other which will defeat one's intention, the court must carry out the intention. Carter v. Succession of Carter, 332 So.2d 439, 441 (La.1976). Thus, Mrs. Newcomb's donations must be interpreted as containing a conditional obligation mandating the maintenance of a women's higher education college.
If the Tulane Board honestly believes that it is no longer practical or possible to honor the intent of Mrs. Newcomb's donations  the continued operation of Newcomb College as a separate and viable entity for women's higher education  our law provides an avenue to be relieved from *36 the obligation. Specifically, the cy pres doctrine, La. R.S. 9:2331, quoted in full by the majority, provides the Tulane Board with a means of petitioning the court for a judgment allowing it to accomplish the general purpose of Mrs. Newcomb's will via the Tulane Board's proposed Renewal Plan. That the Tulane Board has not exercised its rights under the cy pres doctrine begs the question as to whether it can actually establish that its continuance of Newcomb College is impractical, impossible, or illegal.[17]
Because I find that Mrs. Newcomb's donations imposed a condition upon the donations, absent a judgment under the cy pres doctrine declaring the continued operation of Newcomb College impossible or impractical, I find that Newcomb College must continue as a degree-granting college within Tulane University of Louisiana.
Finally, I note that the majority's opinion sets a very bad precedent that if allowed to stand will discourage future donations to all charitable entities. Charitable giving is good and persons in our society should be encouraged, not discouraged, from make donations whether conditioned or not. That is, if a donor cannot rely upon an interested third party (such as a relative, heir, or one with some financial or other real interest in the charity) to force the charitable institution to honor in perpetuity the conditions of a donation, why would one make a donation in the first place? To assume the good faith of a charity that does not want to proceed under the cy pres doctrine to be relieved of the condition of a donation works fine in theory; in practice, I think someone ought to be able to state a cause and right of action to make the charity live up to its obligation when it so graciously accepted the conditional donation in the first place.
For the foregoing reasons, inter alia, I would reverse the trial court's judgment and remand the case for further proceedings consistent with herewith.
NOTES
[1] Greenwood Cemetery, Alice Bowman and William Robertson were Mrs. Newcomb's only other legatees.
[1] If the plaintiffs were solicited by the Tulane Board or its agent for a donation to the H. Sophie Newcomb Memorial College ("Newcomb College") for the purpose of operating a "college" and made a donation to Newcomb College for that purpose, they would have standing to assert that their donations were not being used as per the solicitation. That is, a failure of cause, as that term is classically understood under the Louisiana Civil Code, has occurred and the donors are entitled to the return of their donations.
[2] The trial court's reasons for judgment do not address the plaintiffs' right or standing to bring the instant action.
[3] At a hearing on an exception of no right of action, evidence is admissible to resolve the exception. Exposition Partner, L.L.P. v. King, LeBlanc & Bland, L.L.P., 03-0580, p. 9 (La. App. 4 Cir. 3/10/04), 869 So.2d 934, 941.
[4] Generally, when an exception of no right of action is maintained, the party is given the opportunity to supplement and/or amend the pleadings for purposes of removing the grounds of the pleaded objection. Sanborn v. Oceanic Contractors, Inc., 448 So.2d 91 (La. 1984); Mauberret-Laire v. Lavie, 03-0099 (La. App. 4 Cir. 6/11/03), 850 So.2d 1.
[5] See footnote 1 above.
[6] See Braquet v. Administrators of the Tulane Educational Fund, 304 So.2d 720 (La.App. 4 Cir.1974). Although the majority discusses this case at length, I find that the majority fails to fully understand all of the implications contained therein. Braquet makes no distinction as to whether the heir will ever receive anything from the decedent-donor; rather, the case stands for the proposition that successors have a right to see that their ancestor's wishes are carried out as intended.
[7] 11 Charles E. Aubry & Charles Rau, DROIT CIVIL FRANÇAIS § 727 (Paul Esmein rev., 6 ed. 1956, in 3 CIVIL LAW TRANSLATIONS 522 (Carlos Lazarus tr. 1969); 2 Gabriel Baudry-Lacantinerie & Maurice Colin, DES DONATIONS ENTRE VIFS ET DES TESTAMENTS n° 2803, at 391, in 10 TRAITÉ THÉORIQUE ET PRATIQUE DE DROIT CIVIL (2D ED. 1905); 6 Théophile Huc, COMMENTAIRE DU CODE CIVIL n° 401, at 511 (1894); 5 Charles Demolombe, TRAITÉ DES DONATIONS ENTRE-VIFS ET DES TESTAMENTS n° 267, at 231, in 22 COURS DE CODE NAPOLÉON (1876); 15 Francois Laurent, PRINCIPES DE DROIT CIVIL FRANÇAIS n° 250, at 275-76 (2d ed. 1876); 4 Raymond Troplong, DROIT CIVIL EXPLIQUÉ: DES DONATIONS ENTRE-VIFS ET DES TESTAMENTS n° 2194, AT 363 (1855).
[8] 11 Charles E. Aubry & Charles Rau, DROIT CIVIL FRANÇAIS § 727 (Paul Esmein rev., 6 ed. 1956, in 3 CIVIL LAW TRANSLATIONS 522 (Carlos Lazarus tr. 1969); 2 Gabriel Baudry-Lacantinerie & Maurice Colin, DES DONATIONS ENTRE VIFS ET DES TESTAMENTS n° 2803, at 391, in 10 TRAITÉ THÉORIQUE ET PRATIQUE DE DROIT CIVIL (2D ED. 1905); 6 Théophile Huc, COMMENTAIRE DU CODE CIVIL n° 401, at 511 (1894); 5 Charles Demolombe, TRAITÉ DES DONATIONS ENTRE-VIFS ET DES TESTAMENTS n° 267, at 231, in 22 COURS DE CODE NAPOLÉON (1876); 15 Francois Laurent, PRINCIPES DE DROIT CIVIL FRANÇAIS n° 250, at 275-76 (2d ed. 1876); 4 Raymond Troplong, DROIT CIVIL EXPLIQUÉ: DES DONATIONS ENTRE-VIFS ET DES TESTAMENTS n° 2194, AT 363 (1855).
[9] François Terré & Yves Lequette, DROIT CIVIL: LES SUCCESSIONS  LES LIBERALITÉ n° 424, at 346, n. 4 (3d ed. 1997); 5 Marcel Planiol & George Ripert, TRAITÉ PRATIQUE DE DROIT CIVIL FRANÇAIS: DONATIONS ET TESTAMENTS n° 726, at 902, n. 3 (André Trasbot & Yvon Loussouarn rev., 2d ed. 1957); 2 Gabriel Baudry-Lacantinerie & Maurice Colin, DES DONATIONS ENTRE VIFS ET DES TESTAMENTS n° 2806, at 392, in 10 TRAITÉ THÉORIQUE ET PRATIQUE DE DROIT CIVIL (2D ED. 1905); 6 Théophile Huc, COMMENTAIRE DU CODE CIVIL n° 401, at 511 (1894); 5 Charles Demolombe, TRAITÉ DES DONATIONS ENTRE-VIFS ET DES TESTAMENTS n° 268, at 231-32, in 22 COURS DE CODE NAPOLÉON (1876); 15 François Laurent, PRINCIPES DE DROIT CIVIL FRANÇAIS n° 248, at 273-74, & (2d ed. 1876).
[10] According to the Tulane Board and the majority, no one has the capacity to enforce the terms and conditions of Mrs. Newcomb's donations other than the Tulane Board. I find that proposition to be incredible if not ludicrous. See and compare footnote 1 above.
[11] In both the 11 October 1886 letter making the initial $100,000 donation to the Tulane Board for the "H. Sophie Newcomb Memorial College" and the 12 May 1898 testament making a bequest to the "H. Sophie Newcomb Memorial College," Mrs. Newcomb expressly and unequivocally made a donation to and for a college. The word "college" is not ambiguous in any way; Mrs. Newcomb's donations were to and for a college as that term was understood in the ordinary course of communications in the years 1886 and 1898.
[12] Contained in the record of the hearing on the preliminary injunction are several letters written by Mrs. Newcomb when she made the initial donation to the Tulane Board in 1886, handwritten minutes of Tulane Board meetings accepting the donation and discussing use of the donated funds, various resolutions passed by the Tulane Board regarding maintaining the separate identity of Newcomb College in keeping with Mrs. Newcomb's donative intent, et cetera.
[13] Were not such donations intended by the solicitations for use by and for that women's college and for no other entity or purpose?
[14] The Tulane Board goes so far as to separate these into paragraphs in its typewritten version of Mrs. Newcomb's donation. The alleged "non-restricting" language is contained in one single paragraph and should be read and interpreted accordingly.
[15] A university consists, by definition, of more than one college. One cannot have a university with only one college.
[16] The majority apparently places emphasis on the fact that no one applied for admission to Newcomb College in 2006. This is true, but only because Newcomb College refused to accept applications to Newcomb College in 2006 and thereafter.
[17] The Tulane Board argues, and the majority agrees, that because Mrs. Newcomb's will does not impose any conditional obligation on her testamentary bequest, the cy pres doctrine does not apply. I disagree for the reasons articulated in detail above. I suggest, however, there are several things the Tulane Board could do to ensure continued operation of the college  i.e., redesign the college's curriculum by eliminating all or most electives; assign regular Tulane faculty as Newcomb teaching staff part-time, paying such staff from both Tulane and Newcomb's separate accounts on a proportional basis; et cetera.